# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JACKIE LEE MACK,

        Petitioner,                          Case Number: 06-CV-10639

v.                                           HON. LAWRENCE P. ZATKOFF

KURT JONES,

        Respondent.

_____/

## **OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

### I. Introduction

Petitioner Jackie Lee Mack, a state inmate currently incarcerated at the Carson City Correctional Facility in Carson City, Michigan, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the Court DENIES the petition.

### II. Facts

Petitioner's conviction arises from the death of Alison Nelson. Alison's body was found in her vehicle at the Robin Oaks Complex in Midland, Michigan, on December 17, 2001. Midland Police Lieutenant John Oswald testified that he discovered Alison's body and that she was in the back seat, under a pile of clothes, wearing only a pajama top with her breasts exposed.

The medical examiner, Kanu Virani, testified that Alison died as a result of ligature strangulation and blunt force trauma. He estimated the date of death to be December 13, 2001.

Anne Chamberlain, an expert witness in DNA identification, testified that a semen sample taken from Alison matched Petitioner's DNA profile. In addition, one of two blood samples taken from Alison's pajama top matched Petitioner's DNA profile. Petitioner could not be excluded from

being the donor of the second.

Dana Ureche testified that on the evening of December 12, 2001, she met her friend Alison at a local restaurant for a Christmas party. The two women left at approximately 8:00 p.m., in separate cars, and stopped at Petitioner's mother's house to pick up Ureche and Petitioner's daughter. Petitioner was there and chatted with Alison. Ureche and Alison arrived at Ureche's home at approximately 10:30 p.m. They went to bed at approximately midnight. Ureche testified that at approximately 3:00 a.m., she received a phone call from Petitioner. She was awakened again at 5:00 a.m. when Petitioner came home and got into bed with her. About fifteen minutes later, Ureche heard some people walking around. She then heard a door open and a car start. She saw that her own car was still in the driveway and Alison's was gone. A short time later, Ureche went back to sleep. She was later awakened by Petitioner who told her that he and Alison had gotten something to eat and then Alison left.

On December 14, 2001, after Alison had been reported missing, Petitioner spoke to Officer Mark Goulette. He told Officer Goulette that he arrived at Ureche's house at approximately 4:00 a.m. on December 13. He went to bed with Ureche but had difficulty sleeping. He then heard someone moving around in the apartment. He got up, saw Alison, and the two decided to go get something to eat at McDonald's. McDonald's was closed, so Alison dropped him off at Ureche's house, and she left. He said Alison was wearing a black sweater and pants.

On December 17, 2001, Petitioner spoke with Midland Police Detective Donn Cholcher. Detective Cholcher testified that Petitioner stated that he went to Ureche's house at approximately 5:00 a.m. He was unable to sleep and got up to walk around. Alison joined him in the family room where he was watching television. Alison returned to the room after a moment, dressed in a black

2

sweater and pants. Petitioner asked Alison to take him to McDonald's. She agreed. Alison drove her car, but when they arrived, the McDonald's was closed. Alison drove Petitioner back to Ureche's house. She then left.

Detective Cholcher interviewed Petitioner again on December 18, 2001, at 2:30 a.m., after Alison's body had been found. Detective Cholcher testified that Petitioner told him "I know my rights and I don't want to talk about it. I did it. There's nothing else to say. No one else is involved. Dana was sleeping. There's nothing more to say." Tr., Vol. V, pp. 194–95.

Petitioner testified in his own defense. He testified that he arrived home at approximately 5:00 a.m. on the morning of December 13, 2001. He was restless, so he went into the family room to watch television. He stated that Alison soon joined him in her pajamas. They engaged in sexual foreplay for about fifteen minutes. They decided to have intercourse, so he drove them in her car to a nearby park where they had intercourse. They then drove back to Ureche's house. Alison decided to leave after sneaking back into Ureche's home to retrieve her clothes. Petitioner testified that he had not mentioned having intercourse with Alison in his earlier statements to police because he did not want to reveal their intimacy.

### III. Procedural History

Following a jury trial in Midland County Circuit Court, Petitioner was convicted of first-degree murder, supported by alternative theories of premeditated murder and felony murder. On October 17, 2002, Petitioner was sentenced to life imprisonment without possibility of parole.

Petitioner filed an appeal of right in the Michigan Court of Appeals, raising the following claims:

    I.       The trial court abused its discretion when it held that Defendant's prior receiving and concealing conviction was automatically admissible under MRE 609(a)(1) because

> the court was legally required to make a determination whether this theft offense was admissible under the criteria set out in 609(a)(2).
>
> II. The prosecutor denied Defendant the due process of law when the prosecutor intentionally failed to disclose to defense counsel an aggravated assault conviction until after a character witness testified as to Defendant's peacefulness and then used the conviction as rebuttal character evidence of aggressiveness.
>
> III. The trial court abused its discretion when it failed to determine whether admitting evidence of a prior assault conviction was, under the circumstances of a late disclosure, a denial of due process.
>
> IV. The cumulative effect of the above errors and the error set out in Issue VIII denied Defendant his 14th Amendment right to due process.
>
> V. Defendant's conviction must be vacated because the prosecutor's case rested largely on a confession that was the fruit of an illegal arrest based on an arrest warrant lacking probable cause or, alternatively, a warrantless arrest lacking probable cause.
>
> VI. Defense counsel failed to perform as guaranteed by the Sixth Amendment when he failed to challenge the arrest.
>
> VII. The police obtained Defendant's statement that "I did it" in violation of the Fifth Amendment because Defendant was already under arrest and had already exercised his right to remain silent.
>
> VIII. The prosecutor denied Defendant due process when he told the jury that the victim would hear its verdict.
>
> IX. The felony murder conviction must be set aside because felony murder is not properly included within an open murder charge.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Mack*, No. 245057 (Mich. Ct. App. May 4, 2004).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, presenting the same claims raised in the Michigan Court of Appeals. The Michigan Supreme Court denied leave to appeal. *People v. Mack*, No. 245057 (Mich. May 4, 2004).

Petitioner then filed the pending petition for a writ of habeas corpus presenting all but the

4

last claim presented in his state-court appeals.

## IV. Standard of Review

28 U.S.C. § 2254(d) imposes the following standard of review on federal courts reviewing applications for a writ of habeas corpus:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429 (6th Cir. 1998). Additionally, this court must presume the correctness of a state court's factual determinations. 28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous").

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

5

*Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

With respect to the "unreasonable application" clause of § 2254(d)(1), the United States Supreme Court held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . .
>
> [A]n unreasonable application of federal law is different from an incorrect application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 410–11.

### A. Admission of Prior Conviction

In his first claim for habeas corpus relief, Petitioner argues that the trial court abused its discretion when it admitted Petitioner's prior conviction for receiving and concealing stolen property. Petitioner argues that the trial court analyzed the admissibility of the prior conviction under the incorrect court rule.

"Habeas review does not encompass state court rulings on the admission of evidence unless there is a constitutional violation." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (citing *Fuson v. Jago*, 773 F.2d 55, 59 (6th Cir. 1985)). Only "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness," may it violate due process and warrant habeas relief. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). The United States Supreme Court has

declined to hold that the admission of similar "other acts" evidence is so extremely unfair that its admission violates fundamental conceptions of justice. *See Dowling v. United States*, 493 U.S. 342, 352–53 (1990). Although the Supreme Court has addressed whether prior-acts testimony is permissible under the Federal Rules of Evidence, see *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. Therefore, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512. Consequently, there is no Supreme Court precedent that the state-court decisions could be deemed "contrary to" under 28 U.S.C. § 2254(d)(1). *Bugh*, 329 F.3d at 513. Petitioner's challenge to the admission of the prior conviction, therefore, does not warrant habeas relief.

## B. Alleged Prosecutorial Misconduct

Petitioner presents two distinct prosecutorial-misconduct claims. Petitioner's second and third claims involve the prosecutor's use of Petitioner's prior assault conviction during cross-examination of two character witnesses. Petitioner argues that the prosecutor failed to disclose this conviction to Petitioner prior to the character witnesses' testimony. In his eighth claim for habeas corpus relief, Petitioner argues that the prosecutor improperly appealed to the jury's sympathy in his closing argument.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court established that a prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

7

*Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "[I]t is well settled that this disclosure obligation includes evidence that could be used to impeach the credibility of a witness." *Schledwitz v. United States*, 169 F.3d 1003, 1011–12 (6th Cir. 1999). "[T]here is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).

The Michigan Court of Appeals denied Petitioner's claim of a *Brady* violation for two reasons. First, the court of appeals found that the evidence of Petitioner's prior assault conviction was not exculpatory. Second, the court of appeals held that the evidence was readily available to the defense from another source – the defendant. The state court, therefore, held that Petitioner had failed to establish prosecutorial misconduct on this claim. The Court finds that the state court's conclusions in this regard were reasonable, and the Court's confidence in the outcome of the trial is not undermined by the prosecutor's failure to disclose information that was not exculpatory and that should already have been known by Petitioner. Moreover, Petitioner cannot show that his right to due process was violated by the late disclosure because the information was available to him without reliance on the prosecutor's office.

Petitioner also alleges that the prosecutor engaged in misconduct when he appealed to the jurors' sympathy for the victim in his closing argument. Specifically, during his rebuttal argument, the prosecutor stated, "Tell Alison you hear her. Tell the defendant he's guilty." Tr., Vol. VI, p. 90.

Respondent argues that Petitioner's prosecutorial-misconduct claims are barred from federal

habeas review because they are procedurally defaulted. The doctrine of procedural default provides:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default, and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Such a default may occur if the state prisoner files an untimely appeal, *id.* at 750–51, if he fails to present an issue to a state appellate court at his only opportunity to do so, *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994), or if he fails to comply with a state procedural rule that required him to have done something at trial to preserve his claimed error for appellate review, e.g., to make a contemporaneous objection or file a motion for a directed verdict. *United States v. Frady*, 456 U.S. 152, 167–69 (1982); *Simpson v. Sparkman*, 94 F.3d 199, 202 (6th Cir. 1996). Application of the cause-and-prejudice test may be excused if a petitioner "presents an extraordinary case whereby a constitutional violation resulted in the conviction of one who is actually innocent." *Rust*, 17 F.3d at 162; *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

For the doctrine of procedural default to apply, a firmly established state procedural rule applicable to the petitioner's claim must exist, and the petitioner must have failed to comply with that state procedural rule. *Warner v. United States*, 975 F.2d 1207, 1213–14 (6th Cir. 1992), *cert. denied*, 507 U.S. 932 (1993). Additionally, the last state court from which the petitioner sought review must have invoked the state procedural rule as a basis for its decision to reject review of the petitioner's federal claim. *Coleman*, 501 U.S. at 729–30.

If the last state court from which the petitioner sought review affirmed the conviction both on the merits, and, alternatively, on a procedural ground, the procedural-default bar is invoked, and the petitioner must establish cause and prejudice in order for the federal court to review the petition.

9

*Rust*, 17 F.3d at 161. If the last state-court judgment contains no reasoning but simply affirms the conviction in a standard order, the federal habeas court must look to the last reasoned state-court judgment rejecting the federal claim and apply a presumption that later unexplained orders upholding the judgment or rejecting the same claim rested upon the same ground. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

This Court begins its analysis of whether Petitioner's claim is procedurally defaulted by looking to the last reasoned state-court judgment denying Petitioner's claims. *See Coleman*, 501 U.S. at 729–30. The last state court to issue a reasoned opinion addressing Petitioner's prosecutorial-misconduct claim, the Michigan Court of Appeals, held that Petitioner failed to preserve for review this claim because no contemporaneous objection was made at trial.

The contemporaneous-objection rule was firmly established and regularly followed with respect to claims of prosecutorial misconduct at the time of the petitioner's trial. *See, e.g.*, *People v. Buckey*, 378 N.W.2d 432, 440 (Mich. 1985); *People v. Sharbnow*, 435 N.W.2d 772, 775 (Mich. Ct. App. 1989). The state court's reliance on the petitioner's failure to object to the prosecutor's conduct is an adequate and independent state ground for foreclosing review. *See Engle v. Isaac*, 456 U.S. 107, 110 (1982) (concluding that a petitioner who fails to comply with a state rule mandating contemporaneous objections to jury instructions may not challenge the constitutionality of those instructions in a federal habeas corpus proceeding). The fact that the state court of appeals engaged in plain error review of the prosecutorial-misconduct claims does not constitute a waiver of the state procedural default. *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). Rather, the review on those terms constitutes enforcement of the state procedural rule. *See Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).

10

Therefore, this Court may not review Petitioner's claim unless he has established cause for the default and actual prejudice as a result of the alleged violation of federal law or unless he has demonstrated that failure to consider this claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Petitioner fails to assert cause to excuse his procedural default. This prosecutorial-misconduct claim is therefore barred unless he can establish that a constitutional error resulted in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298 (1995).

The Supreme Court has explicitly tied the miscarriage-of-justice exception to procedural default to a petitioner's innocence. *Id.* at 321. Thus, Petitioner must assert a constitutional error along with a claim of innocence. "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Id.* This evidence "must show that it is more likely than not that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt." *Id.* at 327. Petitioner fails to present new, reliable evidence in light of which no reasonable juror would have found him guilty. Therefore, this prosecutorial-misconduct claim is barred from consideration by procedural default.

### C. Petitioner's Arrest and Alleged Ineffective Assistance of Counsel

Petitioner's fifth and sixth claims relate to the legality of Petitioner's arrest. Petitioner argues that his conviction is based upon an illegal arrest that lacked probable cause and that his attorney was ineffective in failing to challenge the legality of his arrest.

"Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been

11

different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morris*, 477 U.S. 365, 375 (1986). There is a strong presumption that counsel's performance falls "within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). While the Court may not review Petitioner's Fourth Amendment claim as an independent claim warranting relief on habeas review, see *Stone v. Powell*, 428 U.S. 465, 494–95 (1976), the Court must consider the merits of the claim in order to determine whether counsel was ineffective in failing to litigate it.

The Michigan Court of Appeals held that Petitioner's counsel was not ineffective because police had probable cause to arrest Petitioner. The state court reasoned as follows:

> [T]he trial testimony, if accepted as credible, reflects that the police had probable cause to arrest defendant for the victim's killing at the time Detective Cholcher placed him under arrest. Defendant acknowledges that he was the last person known to have seen the victim alive. Also, as noted above, there was testimony that defendant told the police that the victim was dressed in street clothes when she left, but her body was found dressed in only a pajama top. From this, the police reasonably could have inferred that defendant lied when he described how the victim was dressed, which would be consistent with an attempt by defendant to conceal having killed the victim. In addition, trial testimony indicated that the police knew that defendant failed to attend a scheduled interview after the victim's body was found, even though he told Detective Cholcher he would attend the interview, which provided an additional factor indicative of consciousness of guilt. This trial testimony reflects that the information to the police when defendant was arrested was sufficient to justify a fair-minded person in believing that defendant committed the murder so as to provide probable cause to support defendant's arrest. . . .

*Mack*, slip op. at 5.

Petitioner has failed to show that the Michigan Court of Appeals' application of Michigan law to determine that a challenge to the lawfulness of the arrest likely would have been meritless was incorrect. Therefore, Petitioner's Fourth Amendment claim lacks merit, and he cannot establish that his attorney was ineffective for failing to raise it.

## D. Alleged Fifth Amendment Violation

Petitioner argues that police obtained his statement, "I did it," in violation of the Fifth Amendment because Petitioner was under arrest at the time his statement was made and already had exercised his right to remain silent.

The Fifth Amendment provides that "[n]o person shall be . . . .compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that, to protect a suspect's Fifth Amendment rights, an individual who has been taken into custody or otherwise deprived of his freedom and is questioned must be advised, prior to any questioning, "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him." *Id.* at 478–79. Once these warnings are administered,

> [i]f the individual indicates at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . [A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Id.* at 473–74. If an accused wishes to invoke his right to remain silent, he must do so unambiguously. *See Davis v. United States*, 512 U.S. 452, 458–59 (1994); *United States v. Hurst*, 228 F.3d 751, 759–60 (6th Cir. 2000) (holding that a suspect's invocation of the right to remain silent must be unequivocal to require that police questioning cease).

The trial court conducted an evidentiary hearing regarding Petitioner's motion to suppress

pursuant to *People v. Walker*, 132 N.W.2d 87 (Mich. 1965).[1] At the evidentiary hearing, Police Detective Donn Cholcher testified that he advised Petitioner that he was under arrest for the charge of open murder and that he advised Petitioner he would like to ask him some questions. He informed Petitioned that another detective was setting up an interview room and it would be a few moments. Petitioner informed Detective Cholcher that he had nothing to say. Detective Cholcher testified that he advised Petitioner he wanted to read him his Miranda rights, which he did. After reading Petitioner his rights, Petitioner stated, "I know what my rights are, and I don't want to talk about it. I did it. There's nothing else to say." Tr., *Walker* hearing p. 34. After answering a question about his vehicle, Petitioner then invoked his right to counsel, and Detective Cholcher ceased questioning him.

Petitioner testified at the *Walker* hearing. He testified that Detective Cholcher questioned him regarding what happened to Alison. Petitioner testified that he specifically and unequivocally invoked his right to counsel several times, but Detective Cholcher persisted in questioning him. Petitioner denied saying, "I did it." The remaining statements attributed to him by Detective Cholcher were made only after Detective Cholcher persisted in questioning him after he invoked his rights to counsel and to remain silent.

The trial court held that Detective Cholcher's testimony was credible and that Petitioner's was not. In addition, the trial court noted that Detective Cholcher's testimony was corroborated by other law-enforcement officers. Thus, the trial court denied the motion to suppress.

The Michigan Court of Appeals held that the motion to suppress was properly denied:

---

[1] *People v. Walker*, 132 N.W.2d 87 (Mich. 1965) requires that an evidentiary hearing be conducted when a defendant challenges the admissibility of a confession.

> Defendant's argument is based on Detective Cholcher's testimony at the suppression hearing that, after he told defendant he would like to ask him "some questions to find out what happened," defendant said, "I really got nothing to say." Defendant contends that Detective Cholcher failed to honor his assertion of his right to remain silent by proceeding to read him *Miranda*[] warnings, thereby indicating that he would proceed with questioning him. In *Adams*, *supra*, in rejecting a claim that the defendant's right to remain silent was violated, this Court held that a police detective was permitted to continue interviewing defendant because he "did not unequivocally invoke his right to remain silent or his right to counsel." *Id.* at 234. Contrary to defendant's argument here, his statement, "I really got nothing to say," did not amount to an unequivocal assertion of his right to remain silent. Rather, this statement, given in response to Detective Cholcher's indication that he wanted to interview defendant, could reasonably be taken as merely expressing that defendant did not have anything important to add to his earlier statements, or that he lacked meaningful information about the victim's death. It was not an unequivocal assertion of his right to remain silent such as an express statement that he did not wish to be questioned further or to continue speaking with the police. Thus, defendant has not established a violation of his right to remain silent.

*Mack*, slip op. at 5–6.

The Michigan Court of Appeals' holding is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The record does not establish that Petitioner clearly and unequivocally invoked his right to remain silent after being advised of his rights under *Miranda*. Petitioner did not state that he was refusing to answer all questions or declare that he was invoking his right to remain silent during the interrogation. "The mere refusal to answer or respond to a question, without more, does not constitute an assertion or reassertion of the right to silence." *Burton v. Bock*, 320 F. Supp. 2d 582, 591 (E.D. Mich. 2004) (Lawson, J.). Habeas relief is not warranted on this claim.

### E.  Cumulative Effect of Alleged Errors

Petitioner alleges that he was deprived of a fair trial because of cumulative error. The Sixth Circuit has expressed doubt about the validity of the argument that cumulative errors may warrant habeas relief in the post-AEDPA era. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002)

(stating that "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief"); *Moore v. Parker*, 425 F.3d 250 (6th Cir. 2005) (same).  Moreover, even if such a claim could merit habeas relief, the Court does not find that errors were committed when considered separately or together that abridged Petitioner's constitutional rights.  Petitioner is not entitled to habeas relief on his cumulative-errors claim.

## V.  Conclusion

Petitioner has not established that he is in the State of Michigan's custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.


                                         s/Lawrence P. Zatkoff
                                         LAWRENCE P. ZATKOFF
                                         UNITED STATES DISTRICT JUDGE

Dated:  January 30, 2008

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on January 30, 2008.

                                         s/Marie E. Verlinde
                                         Case Manager
                                         (810) 984-3290